# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| TASHA M. HUTCHINS, | : | Case No. 3:18-cv-00279 |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | District Judge Walter H. Rice |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

**I.    Introduction**

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a disability, among other eligibility requirements. A disability in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Tasha M. Hutchins applied for Disability Insurance Benefits and Supplemental Security Income in June 2015, asserting that she could no longer work a full-time job and was consequently under a benefits-qualifying disability. Her applications and

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

evidence worked their way through preliminary reviews and eventually landed in front of Administrative Law Judge (ALJ) Stuart Adkins. After a hearing, during which Plaintiff and a vocational expert testified, ALJ Adkins denied Plaintiff's applications on the ground that she was not disabled. (Doc. #6, *PageID* #s 42-63).

Plaintiff brings the present case contending (in part) that ALJ Adkins incorrectly weighed the medical evidence, incorrectly assessed Plaintiff's testimony and symptoms, and "selectively relied on minor medical evidence to rely on his own personal interpretation of the medical professionals' opinions." (Doc. #5, *PageID* #1035). She seeks a remand of this matter for payment of benefits or remanded for further administrative proceedings. The Commissioner finds no error in the ALJ's decision and asks the Court to affirm rather than remand.

## II. Background

Plaintiff was twenty-eight years old on her asserted disability onset date. She was therefore considered a younger individual under social security law. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2] She has the equivalent of a high-school education and earned an online Associate's Degree in business. (Doc. #4, *PageID* #66). She worked in the past as a retail cashier, a fast-food worker, a babysitter, and a waitress.

Although Plaintiff's Statement of Errors focuses on her mental-health problems, her testimony during ALJ Adkins' administrative hearing contained much information about her physical-health problems. Exploring each aspect of her testimony does much to illuminate

---

[2] Further citations to social security regulations will identify only the pertinent Disability Insurance Benefits regulations with full knowledge of the corresponding Supplemental Security Income regulation.

her daily issues at the time of the ALJ's hearing.

Plaintiff testified during ALJ Adkins' administrative hearing that since age twelve, she's had Type 1 (formerly referred to as Juvenile) Diabetes. She has widely fluctuating blood-glucose—she's been "on this rollercoaster," she says. *Id*. at 72. Her last A1C test result was twelve.[3] *Id.* Dealing with diabetes since age twelve has been a daily struggle for Plaintiff. *Id*. If she drinks only eight ounces of orange juice, her blood glucose rises quickly—in just two hours it can rise above six hundred. When this happens, she could wake up and throw up. She testified, "[E]very day I don't feel good…." *Id.* at 73. Type 1 Diabetes causes her additional problems:

> With the diabetes, I'm up probably 15, 20 times in the middle of the night going to the bathroom. That's another issue I have at work. A lot of companies don't want you to keep a drink on-hand, because—for whatever reason, but I need to keep sugar next to me in case I would feel shaky or, you know, be able to use the bathroom at your leisure. [T]here are times when I've gone to the bathroom ten times in an hour, and…, that's not always feasible. Now, I'm not saying everyday is like that. Not every day is horrible. [T]here are days I don't get out of bed. I could sleep—I get so depressed with my condition and not feeling good that I will sleep for two or three days…, and my mom is coming down checking on me, making sure I'm still alive…. I keep a portable potty chair next to my bed. Like, I feel like an old lady, because I can't make it upstairs to go to the bathroom in time. And I have an extra bucket. It's my puke bucket. And so that's what my normal day looks like….

*Id*. at 73-74.

Plaintiff has pain in her legs due to neuropathy. Her leg pain is not always constant. Sometimes it is a dull ache. She added, "[C]old weather really hurts it, and then sometimes

---

[3] The Hemoglobin A1C is the primary test used for diabetes management and diagnosis. It provides information about a patient's average blood glucose level for the past three months. An A1C result of twelve denotes very high-average blood-glucose levels for the previous three months. https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test

I'll get, like, shocks. It almost feels like a jolt of electricity, like, in the nerves, and it's just…, a real excruciating pain …." *Id*. at 74. When her leg pain gets worse, it makes it hard for her to sleep at night. *Id*. at 73.

Plaintiff's vision fluctuates. Some days she can see clearly; other days her vision is blurry and images of people become blob-like. *Id*. at 75.

During her good days, Plaintiff can cook, clean, and do things a normal person can do, but on a bad day, she can't do any of that. She has a bad day half of the time. *Id*. at 81. Even on a good day, she's still has pain—she is in pain every day. *Id*. at 76. She cannot sit for very long because she must be able to move her legs. When her legs start hurting really bad, she soaks in a hot bath. This helps lessen her leg pain. *Id*. at 77-78. There are times during the middle of the night when she wakes up and takes a hot bath.

Plaintiff testified that she cannot stand in the same spot for long because she gets back pain. She can lift a small laundry basket, a most. Her eleven-year-old son does heavier lifting and household chores for her. *Id*. at 79-80. She has her son with her every other week. On weeks when he is not with her, he will check on her to make sure she is ok. *Id*. at 81. She gets depressed in his absence and without his encouragement. *Id*. at 80.

In 2015, Thomas L. Butler, LSW/PCC completed a form, stating that he first saw Plaintiff on June 25, 2015 and last saw her on July 16, 2015. He reported that Plaintiff's short-term memory was significantly impaired due to her distractability. She had concrete thinking. Her general attitude was guarded and suspicious. She had very low tolerance of stress and high irritability. She attempts to avoid conflict by not putting herself in public situations. Plaintiff would have extreme difficulty in social interactions due to "explosive

outbursts." *Id*. at 867. Mr. Bulter diagnosed Plaintiff with Bipolar Disorder, most recent episode severe manic without psychotic features. *Id*. at 868.

Four months later, in mid-November, Mr. Butler completed a second form indicating that he had treated Plaintiff since June 25, 2015. *Id*. at 888. He noted that Plaintiff had been cooperative throughout treatment. *Id*. at 889. Her mood was most often severely expansive and labile. Her speech was often loud, pressured, and rapid. She had extremely poor stress tolerance, even to low stress. She became hostile when confronted. She has very poor focus, is easily frustrated, and his difficulty finishing tasks due to distractability and general inability to sustain concentration. She had lost interest in things she once enjoyed doing. And Mr. Butler opined that she was not "able to maintain any sustained meaningful employment due to severe mood related issues. Conflict, angry and perhaps assaultive behavior would be most likely putting [her] or others at risk. There would be severe impairment in work role functions." *Id*. Mr. Butler explained that Plaintiff's symptoms had worsened during the past eighteen months. *Id*. at 890. He diagnosed her with Bipolar I Disorder, more manic, severe. *Id*.

The administrative record contains Mr. Butler's treatment notes about his sessions with Plaintiff from June 2015 to July 2017. *Id*. at 891-97, 987-1007.

### III. Standard of Review and ALJ Motta's Decision

Review of ALJ Adkins' decision considers whether he applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of

5

evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL 3549787, at *1 (S.D. Ohio 2018) (Rice, D.J.).

The ALJ reviewed the evidence and evaluated Plaintiff's disability status under a each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520.

His more pertinent findings began at steps two and three where he found that Plaintiff had severe impairments—diabetes mellitus, neuropathy, gastroparesis, and bipolar disorder—and that her impairments did not automatically qualify her for benefits. (Doc. #6, *PageID* #s 39-42).

At step four, ALJ Adkins concluded that the most Plaintiff could do (her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of "light work" with many limitations. He found, for example:

> [S]he can push and/or pull at the same exertional levels but limited to occasionally in both upper extremities. She can never climb ladders[,] ropes[,] or scaffolds, but can occasionally balance and crawl…. [She] is limited to simple routine tasks, but not at a production rate pace. She can have occasional interactions with supervisors, coworkers and the general public. She can tolerate occasional changes in a routine work setting defined as 1-2 per week. [She] would be off-task 10% of the workday.

*Id*. at 42. The ALJ also found at step four that Plaintiff was no longer able to work jobs she had done in the past (retail cashier, waitress, etc.).

At step five, the ALJ relied on the vocational expert's testimony and concluded that there were a significant number of full-time jobs in the national economy that Plaintiff can

perform. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income.

IV. **Discussion**

A. **Dr. Ward**

Social Security Regulations require ALJs to place controlling weight on the opinions of treating physicians or psychologists if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2016). Additional factors must be considered—supportability, consistency, specialization, etc.—if controlling weight does not apply to the treating physician's or psychologist's opinion. *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). The Regulations require ALJs to provide "good reasons" for the weight placed upon a treating physician's or psychologist's opinion. *Wilson*, 378 F.3d at 544.

Plaintiff contends that the ALJ erred by not discussing or weighing the opinions provided by psychologist Dr. H. Owen Ward "who treated [Plaintiff] on several occasions…." (Doc. #5, *PageID* #1035). This contention misses the mark because the administrative records does not contain any opinions from Dr. Ward. There is no evidence in the record showing that Dr. Ward, himself, treated Plaintiff. Instead, Mr. Butler treated Plaintiff for Bipolar Disorder as seen throughout his treatment records. (Doc. #4, *PageID* #s

7

891-97, 987-1007). Mr. Butler completed and signed the July and November 2015 mental-work assessments. No signature by Dr. Ward appears in these forms, there is no statement or other indication that Dr. Ward concurred with Mr. Butler's opinions, and there is no mention of Dr. Ward except in the address where the forms were sent. *See id*. at 866-67, 887-88. Without an opinion or treatment records from Dr. Ward, the ALJ did not err with regard to Dr. Ward. *Cf. Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) ("The key problem with the ALJ's decision, however, is that it completely fails to acknowledge the expert opinion of … Bowen's treating psychologist.")

Accordingly, Plaintiff's challenges to the ALJ's omission of Dr. Ward in his decision lacks merit.

B. **Plaintiff's Symptoms**

Plaintiff argues that the ALJ incorrectly discredited her subjective symptoms of pain in direct opposition to the following passage in a Social Security Ruling:

> In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, we do not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence.

Soc. Sec. R. 16-3p, 2016 WL 1119029, *3 (March 16, 2016).

The ALJ's decision is not directly opposite this statement in Ruling 16-3p. Instead, the ALJ described, *see* Doc. #4, *PageID* #42, and applied the correct two-step process for evaluating symptoms. This is seen in his finding that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms …." (Doc. #4, *PageID* #44). For Plaintiff's argument to work, the ALJ would need to have concluded that

8

she did not have a medically determinable impairment for the reason that the objective medical evidence did not support the severity of her symptoms. That this would have been an error—or "directly opposite," as Plaintiff says, to Ruling 16-3p—is seen in an example this Ruling provides:

> [I]f an individual has a medically determinable impairment established by a knee x-ray showing mild degenerative changes and he or she alleges extreme pain that limits his or her ability to stand and walk, we [the Social Security Administration] will find that individual has a medically determinable impairment. We will proceed to step two of the two-step process, even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence.

2016 WL 1119029, *3. This is what ALJ Adkins did. He found Plaintiff had medically determinable impairments that could reasonably cause her symptoms. Then he proceeded to step two of the two-step process where he properly considered the severity of Plaintiff's symptoms. And by proceeding in this way, the ALJ did not reach a flawed assessment of Plaintiff's residual functional capacity.

Accordingly, Plaintiff's challenges to the ALJ's assessment of her symptoms lack merit.

C.     **Vocational Expert**

Plaintiff maintains that the ALJ erred in relying on vague testimony by the vocational expert who testified during the administrative hearing.

The vocational expert testified that a hypothetical person who is off task a maximum of ten to twelve percent of the time, would be given increasingly serious notices (verbal then written) that if unheeded, would lead to the termination of her or his employment. (Doc. #4, *PageID* #89).

9

Plaintiff objects to the vocational expert's vagueness with respect to which level of off-task behavior employers will tolerate. She asserts, moreover, "As a matter of policy, the vocational expert should supply more concrete answers to certain behaviors instead of a range of options." (Doc. #5, *PageID* #1037). Neither of these arguments advance Plaintiff's efforts to overturn the ALJ's decision.

Plaintiff's argument misses that her counsel had the opportunity to question the vocational expert about any testimony he thought was vague. He did so, "to double check the standard for off-task behavior…." (Doc. #4, *PageID* #88). The vocational expert confirmed that he thought the standard was ten to twelve percent and added, "It's just not in the DOT, but my experience in the labor market in unskilled and certain semiskilled work setting, the ceiling is 10% to 12% off task, outside of scheduled breaks and lunch breaks." *Id*. He further added that this was in an eight-hour workday. *Id*. Counsel then asked the vocational expert to clarify what happens "if it goes above the 10% to 12%...." *Id*. at 88-89. This is when the vocational expert said the worker would be given increasingly serious notices (verbal then written) that if unheeded, would lead to the termination of her or his employment. *Id*. at 89. Counsel did not ask for further clarification of any testimony he thought was vague. The ALJ was not required to further clarify the vocational expert's testimony regarding the off-task limitation because counsel did not bring any other alleged conflict to the ALJ's attention of the ALJ and any alleged conflict was not so obvious that the ALJ should have discerned them for himself. The ALJ, therefore, did not err by neglecting to ask the vocational expert to clarify vague testimony. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006); *see also McClanahan v. Comm'r of Soc.*

*Sec.*, 474 F.3d 830, 837 (6th Cir. 2006) ("[C]ounsel may not now complain because he failed to cross examine [the expert] when he had an opportunity to do so....").

Plaintiff also fails to show that the ALJ erred by relying on the vocational expert's testimony simply because the DOT "is severely outdated and includes many jobs that are obsolete." (Doc. #5, *PageID* #1038). In support, Plaintiff relies on information included in the O*NET and argues that according to its "crossover" feature, the job of clerical assistant includes "constant" communication, which she claims directly counters the ALJ's limitation to "occasional" interaction. (Doc. #5, *PageID* #s 1038-39). Even if Plaintiff is correct about the job of clerical assistant being obsolete, the ALJ relied on a significant number of other jobs the vocational expert identified, including mailroom clerk (24,770 jobs available) and routing clerk 80,660 jobs available).

Accordingly, Plaintiff's challenges to the ALJ's reliance on vocational expert's testimony lack merit.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability decision on January 30, 2017 be affirmed; and

2. The case be terminated on the Court's docket.


August 29, 2019                                      *s/Sharon L. Ovington*
                                                                           Sharon L. Ovington
                                                                           United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).